Are you splitting time? We are. Okay, so could you please watch the clock and after you finished your portion, you can then give it to your colleague. Thank you, Your Honor. May it please the Court, Ari Holzplatz for providers. I'm dividing time, as Your Honor noted, with Ashley Parrish, counsel for AKF, and the patients we would like to reserve four minutes for rebuttal. Mr. Parrish will address AB 290's disclosure mandates. I will address the reimbursement penalty, which should be held invalid because under First Amendment precedent from Buckley to Bonta, AB 290's massive financial penalties on charitable contributions to an expressive association trigger and fail exacting scrutiny. Now the state previously said that the reimbursement was needed to prevent steering that would harm end-stage renal disease patients, ESRD patients, and various supposed effects of that steering. But after failing to identify any evidence of steering in California, the state has invented a new justification on appeal that by enabling AKF to help very low-income Californians afford life-saving medical care, these contributions to AKF supposedly raise insurance premiums for all. But you don't disagree that that is a valid government interest. You would just say that's not happening in this issue, it's not increasing the premiums. It is not the valid government interest that either the legislature intended with this law or the state developed below, and we also dispute whether there is any that this is occurring. So is that a waiver argument that they didn't develop it below so we can't consider it? I think it has two impacts on the analysis. The first is that under heightened scrutiny it has to be the actual justification that the legislature was relying on, and it's strong evidence that that was not the actual justification when the state is not presenting that rationale below. The second is that under heightened scrutiny there needs to be evidence. There can't just be supposition or reasoned argument by lawyers. And when appellate counsel switches the rationale on appeal, you've deprived the parties and the court below of actually developing or testing the evidence of that theory. So I think those are the two reasons that changed rationale matters, but there's also no actual evidence that this new rationale, which is a rationale of reduced impact on the insurance market, is real. There's no evidence of that. Now the states, and I want to dive into that. Well, but that's interesting because I never understood, I mean, I guess you're right. That's how it happened in the steering context. You'd say, well, yes, you have a government interest in preventing steering, but there's no evidence of it. And that's basically what the district court said below. So you're saying that same analysis has to apply here, that even if in theory this were a valid interest, which, I mean, you would say just amorphously, it's inherently true that the government has a valid interest in controlling and regulating insurance companies, right? And then premiums. I think that's a pretty high level of generality. Right. I don't think conceding that means you're conceding anything in your case, but you're just saying we have to dig down deeper, and because we didn't have the opportunity to do that before the district court, it's not valid for us to accept it. At most, we could remand it and say, hey, we need to take a look at this. Well, and I think, let's think about the difference of the way this interest plays out. So when there's a steering interest, the concern is that patients are being tricked into plans that are not in their interest. And if there is an insurance market impact of that, you're saying, well, we don't think the insurance market should be harmed by patients who didn't even want this insurance anywhere. It's not in their interest. That's very different from an interest which says we want to take the very sickest, very poorest patients who want and benefit from this insurance and pull them out of the market. And I think that's a fundamentally different type of interest than the way that the state articulated this below, and it casts doubt on this being the interest the legislature was actually interested in because this was a pro-patient policy. So setting that aside, I mean, I thought your best argument was, okay, fine, accept this as a valid interest. You still got to, well, I guess we're jumping ahead, and we'll get to that about whether this is expressive or not. But if this is expressive, they still have to show that it's narrowly tailored, and there's a ton of things if that were a valid interest from the government, I tend to think it is, but you've made a case why it might not apply here. There's a lot of other things they could have done to narrowly tailor. They could have just regulated the reimbursement rates. I agree completely. Okay. And I also think You just want to head it off at the pass. You don't want us to get to the narrow tailoring. No, I think the narrow tailoring is the cleanest, actually the easiest way to resolve the case. I think there's many other ways that this interest could have been served without kicking the poorest and sickest patients off of the insurance. I think the law itself is also not targeted at that concern that's articulated here. So coming back to what I was saying, the district court kind of avoided all this analysis in part because it found on this provision it was not expressive. It was actually economic, right? It was a quid pro quo arrangement effectively. Can you respond to that argument? Because that seems to be where we have to decide which bucket this falls in, and it's a completely different analysis. You've got really good arguments if we say it's expressive. The district court may not have erred if it's not expressive. So I think from Buckley to Bonta, the Supreme Court's answered this question, and specifically, Your Honor mentioned quid pro quo. I think what the campaign finance cases in Bonta frankly answer, that goes to the strength of the government's interest. That's really a step two application of heightened scrutiny. Quid pro quo arguments are made in the campaign finance context all the time. We don't say that contributors to campaigns don't have a protected First Amendment right, and we say that they may, they have a protected First Amendment right, and if the government can show that a particular campaign finance restriction is tailored to, that that concern is real and it's tailored to that concern, then that might satisfy heightened scrutiny, and we can see this in Bonta itself. The argument that the government made in the California government, same government made in Bonta, was that the disclosure regime in Bonta was needed to prevent self-dealing, to facilitate fraud investigations, very similar type of concerns as are articulated here. That went to the strength of the interest and whether it was narrowly tailored, not to whether there was a First Amendment interest in the first place. We also know this from general First Amendment principles. The Sorrell case, I think, said it, but many have said it, that a great deal of vital expression that is protected by the First Amendment results from economic motive, so the presence of some kind of economic benefit or economic motive is certainly not sufficient. Here, it was indisputed that the providers have many reasons for contributing to AKF, including their support for its charitable mission, its expressive activities. I think it's also important to emphasize that AKF has, for 50 years, engaged in a wide range of expressive activities, from education to advocacy and this direct charitable interest, and those and the contributions that providers make support all of those interests. The opposing counsel points to some language where AKF told the providers that they had to provide their fair share of the funding as part of a smoking gun. So, I think, I have a couple responses to that, Your Honor. I think it's not surprising that a charitable organization that is trying to provide support to sick patients would ask all of the providers who treat those patients to contribute. What the facts show is that the majority of providers whose patients benefit from AKF's assistance don't actually contribute, and that the majority of patients use AKF's assistance for public insurance, not for private insurance. But I don't think, as I said to your colleague, I don't think that the possibility that there may be economic motives or economic concerns takes us outside the First Amendment. I think what it does is it may demonstrate that there is an interest that the state, if it can present a narrowly tailored law and can show there's a real problem, has an interest in addressing, and that's the second step of the analysis, and it hasn't shown that here. So, I do, unless the Court has further questions about the presence of the heightened scrutiny, I do want to make sure to address the application here. And again, I think there's a new rationale here. That's one reason that that can't satisfy heightened scrutiny. The second, as we've discussed, is that the law is not narrowly tailored, and there is also just simply not enough evidence to support the notion that this law, in operation, the reimbursement penalty will have the impact that the government claims it will have. So, yeah, I actually am interested in hearing this, because when I saw this, I thought, well, no, that's, it seems intuitive that it would increase the premiums if more, if higher, I mean, how could it not? If higher rates for the same services are being paid out by the insurance company, they have to recoup that. The only way to do that would be through increased premiums. So, I mean, you're saying that that's not true, so I'm very interested in hearing how. I do, and I'm now going into my colleague's time, so I would like to answer your question, and then I'll sit down. So, the state's own expert here conceded that this depends on how many patients are actually changing their choices. And he said, if a small number of patients switch, then you wouldn't have these impacts. And there's just simply no evidence that there would be, that the reimbursement penalty would have, would move that many patients. I mean, to, when AB290, the law at issue here, was enacted, there were only two or 300 patients who were getting AKF assistance who were on the Affordable Care Act's exchange. If the reimbursement penalty took effect, then AKF's assistance might continue to support some of them. We don't know. That's an uncertainty in the law. And then some of those patients might find other ways to stay on private insurance. We're now talking about such a small number of patients that even their own expert, I think, conceded that that may not have an impact on premiums. But I'll sit down now. Thank you, Your Honors. May it please the Court, Ashley Parrish on behalf of the American Kidney Fund, its two patients, Jane Doe and Stephen Albright, and also the patient advocacy group, Dialysis Patient Citizens. What I'd like to do is three quick things. Judge Nelson, I'd like to explain why this is so important to AKF, which I think goes to the questions you've been asking about narrow tailoring. I'm going to address quickly the two disclosure mandates, which I think the analysis is fairly straightforward for this Court. And third, I'll say two sentences about severability. On the why this is so important, as my colleague mentioned, for 50 years, AKF has been providing educational support, clinical studies and advocacy, personal support, and also financial assistance to these very sick There's two features of that federal scheme that are very important. One is that the federal government has tried to prevent discrimination by private insurers that would push them back onto the public plans. And two, most importantly for AKF, since 1997, there has been an opinion that we've been operating under that allows us to do this, that the federal government has approved that sets up how the financial assistance works. The reason, Judge Nelson, I said this goes to your question, is that once you get rid of the steering rationale, the only reason why the steering rationale works, it says two things. It says one, is that AKF is somehow facilitating the steering. And two, that the patients are being harmed because they're being put on plans that they otherwise wouldn't be on. There's no evidence for that, and there's a lot of evidence that goes the other way. Well, the District Court already determined that. We'd have to reverse the District Court on that. If we were to adopt the steering analysis, we'd basically have to reverse the District Court's analysis. Yes, I agree with you, yes. But my point goes to the narrow tailoring, is that once you get rid of that steering, and what you're talking about is risk pools, what does AKF have anything to do with it? Why does a charitable organization now have to be compelled to speak in the way that they want? Why do they get to interfere with our donors and our patients and our associational rights? And so the thing I'd say just at the start is that once you realize that there's no steering, the idea that a charitable organization is now at the center of this statute makes no sense. And it just goes to everything you said, Judge Nelson. That's the District Court, or the argument, that's a quid pro quo relationship, so that AKF gets the money from the providers, it gives it to the patients, the patients go for the better private insurance that raises the premiums, and then the risk pool is changed. I mean, that was their expert theory. Well, Your Honor, I go back to what my colleague said. I won't spend too much time on this, but the key there is that when AKF provides this assistance, the patients have already selected their plans. So it's not like it seems, which is that the assistance causes them to then choose the private insurance. It's the other way around. We don't know what, we're not in the business of insurance at all, so I do understand the abstract economic theory that there might be incentives here, but the real key there is, is this actually causing any patients to change the choices, or are they picking these plans for their own health reasons? And the evidence shows it's for their own health reasons, and the quid pro quo idea has just not been proven, and even their own expert, for reason my colleague just mentioned, doesn't explain how or why enough patients would be making this decision as a result of financial assistance, as opposed to because they really need these plans and they make that decision separately from any question relating to the assistance. Your Honors, if I could turn to the second thing, which is talking about the two forced compelled speech disclosures, because I think this is quite easy for the Court. It is clear that because we're compelled to speak things we don't want to say, one, disclose the names of patients to a third party, and two, provide information about insurance when we're not in the business of doing that. That's a content-based, a compelled speech is therefore constitutionally, presumptively invalid, unless they can prove that this falls within the exception for commercial speech. Well, yeah, and I'm not sure why it doesn't. Help me understand what your big complaint is here, because all it is is a disclosure. It's just factual information. So, Your Honor, obviously that's the same type of argument that Bonta rejected and NILFA rejected, which is that forcing an organization to speak, now what your question gets to, and I take the point, which is why don't we want to speak, and there's really a number of reasons. One, on insurance itself, we are very careful to be completely neutral about insurance, because we don't want to be in the business, so we don't want to, if you look at the actual provision. You're just trying to get patients care. Care, in fact, and as much removed from insurance as possible, so that we're not in that, and if we have to track, and you can, if you look at the provision, it's very burdensome in terms of, we have to know all about the employer plans, all the private plans, that's just not what we do, and so it's away from our mission. In the case of patients, we don't want to disclose the patients to the insurers, because that creates a type of chilling, because the discrimination that happens when they find out who is getting this financial support, creates an incentive for them to take them off of their plans and put them back to the public plans, which is why we have that preemption argument, because it's an obstacle to what the federal government is trying to do, and the system that we're trying to operate within, which is that we're neutral on all these issues. We're not trying to skew it one way or the other, and your honor, I would say that under the case law, it's very clear that in order for it to be commercial speech, two things have to happen. One is, it has to be pure commercial speech. It can't be intertwined with protected speech. It's clear here that however you look at it, even if it is, some of it is commercial speech, which we doubt, it's certainly intertwined, and second, it's not the situation where they're trying to have a disclosure relating to a product that you're selling an advertisement. What we're, this has nothing to do with what we're providing. Now, they try to get around that by saying, well, you are providing this financial assistance, but then the disclosure is not to the parties that would need that disclosure. It would be different, for example, if the state were regulating what we had to say to the patients who were getting the financial assistance. This is a third party that's using this information for what we think is mischievous and improper reasons, and we don't want to speak to them about it, and let me finally say about the severability, and I'll be done, which is all I would say is that there's no severability provision. That's really key. Second, Your Honor, once you get rid of the steering rationale, the whole statute makes no sense. It was all pivoted around that, and third, I would say is if you think about the reimbursement penalty in particular, if the forced compelled disclosures go down, then that also goes down, and all you have to look is at page 41 of my reply brief or my colleague's reply brief, and we cite in detail where the state below said these were essential, they're linked together, they're critical, they can't be separated, and with that, Your Honor. Can I ask one question, and maybe it's simple, hopefully. The safe harbor section 7 point, what, isn't that moot? I mean, the date's gone by which any of the safe harbor provisions would have applied. Is that still at issue? Okay. Yeah, I don't think so. Okay, all right. Thank you, Your Honor. Appreciate it. He has some time for rebuttal. Good morning, and may it please the Court. Deputy Solicitor General Chris Hu for the state. I plan to focus today on the same two issues that my friends on the other side have focused on, namely the reimbursement cap and the patient disclosure provision, and in particular, I listened with interest to Judge Nelson's questions about the application of heightened but before I do, I just want to start really briefly, because I think it's helpful to recount how the District Court summarized the evidence that's relevant to the reimbursement cap. As the District Court recognized, the American Kidney Foundation serves as a financial intermediary for funneling donations from the dialysis providers into premium payments, and the dialysis providers ultimately reap an enormous financial benefit, with a relatively small outlay in donations turning into a much larger payment in the form of reimbursements at the private reimbursement rate. And by the way, that reimbursement rate is enormously high because of the market power that these two companies, Fresenius and DeVita, have in the dialysis market. They use their market dominance to command reimbursement rates that are far higher than the cost of care. So if the District Court correctly concluded, and as Judge Ikuda just alluded to, this is a quid pro quo arrangement that is fundamentally transactional. It's like any number of other business relationships that are subject to ordinary economic regulation. But counsel, I mean, that's true of so many things. If I'm donating to a charity or an organization that goes in and advocates for tax benefits that are helpful to me, I'm doing that on a transactional basis. That doesn't mean I don't have free expression, you know, free First Amendment rights to make that donation and go try and get the incentives, you know, through Congress. You wouldn't say, oh, well, that's just transactional. So you can't make the, you can't pursue that. No, Your Honor. The state has recognized that in the mine run of situations, charitable contributions, including charitable contributions that are directed at changing policy, are likely and perhaps almost certainly going to be protected by the First Amendment. Supreme Court has recognized that in the campaign finance context and, you know, even outside the campaign finance context, I think we would agree that it's true if someone makes a donation to a charitable organization or a union makes a donation to a candidate that they like. What's really unusual here is, and I'm not sure I've ever seen a situation where there's a charitable contribution that in fact makes a profit for the donor. So there are many situations where someone might be financially interested. No, that's not true. I mean, take me out of it, but somebody who wants their tax rate lower makes the donation and they're like, hey, I can give you $100,000 and guess what? It's going to decrease my taxes by $500,000. They view it solely as an investment. I think there are a couple reasons, Your Honor, why that situation might be different. So one, when you're donating to a candidate that's advocating for change in tax policy or other economic policy, you're participating in the marketplace of ideas. This is at the apex of First Amendment protection where we recognize we want robust free exchange of ideas in the political realm. That's not what's happening here. And moreover, that change in policy is, in my view, much less direct than what's happening here, where, for example, just to look at the numbers, we know, for example, J.P. Morgan looked at this and saw that in an ordinary year, DeVita might donate on the order of $100 million to the American Kidney Foundation and get back between $500 and $700 million in reimbursement payments. So it's a very direct financial relationship. In my view, I'm sorry, Your Honor. The expert, I read the expert declarations really carefully, and the expert really was struggling and really was unable to draw a line between the donations that were given by the providers and any increased risk in the insurance pool. And I understand the intuitive appeal of your argument, but there didn't seem to be any evidence actually supporting that. Even the expert was not able to say that. So where is the evidence if your own expert couldn't draw that line? So, Your Honor, I agree that the causal relationship here is somewhat complex, and I think you see that in the Burtko expert report. That said, his report does support the conclusion that a shift of these ESRD patients from public insurance to private insurance on the exchange would drive up costs and would have an effect on premiums. And so I know that Your Honor has already looked at it, but there's the Burtko expert report. There's the supplemental Burtko expert report where he incorporates the Trish study, which corroborates his findings. And you also have a report commissioned by AKF itself. And while I won't talk about the numbers in that record, I'd refer the Court to supplemental excerpt of record page 303 for that one. Even if there was an increase in the end-stage mental disease patients in that period of time, there wasn't any evidence that I could see that was caused because of programs like AKF. Now, what do you think is your best evidence of that? I'm sorry, could you repeat that question, Your Honor? Yeah, there might be evidence that the number of dialysis patients increased who were on private insurance, but there is no evidence that AKF's program caused that. So Your Honor, one thing that I can see, because I think it's just undisputed in the record, it's clear that not every patient who's receiving these premium assistance payments is shifting from public to private insurance. Many of them are staying on public insurance. So it's not as if we can say every time there's a premium assistance payment made, that person is necessarily going to shift from public to private insurance. But for the ones who do shift, and that shift has been observed, it's hard to think of any other reason other than the premium assistance that they would be doing that, because otherwise they wouldn't be able to afford the private insurance. The hard to think of any other reason isn't really evidence, right? Well, I mean, this is something that's covered in the Burtko Expert Report, and it's, I mean, as the Court is aware, these health insurance markets are complex. It can be hard to trace for any individual patient what mix of motivations is driving their particular decision, right? And so I do want to shift, because I'm hearing some skepticism about, you know, maybe, what if there is some expressive element to this? What if heightened scrutiny does apply? And I just wanted to point to what we argued below, what the legislature identified as part of the interest motivating the statute, and what the District Court actually did with that. So as the Court is aware, the District Court agreed with our argument that this is non-expressive conduct. That said, the Court then went on to actually apply heightened scrutiny. It went on to apply a form of intermediate scrutiny, which is an argument we did raise and preserve below. And what the District Court did, and this is at ER 50 and 51, is the District Court talked about how there were legislative interests beyond direct steering. So, for example, if you look at Section 1G, H, and I of the Legislative Statement of Findings, they're talking about manipulation of the insurance market in ways that go beyond the direct steering that I've heard from my friends on the other side. So let's assume that's true. Why don't you just adopt a limit, a reimbursement limit? Like that's more narrowly tailored than this, and that would get at it. So why isn't that just enough for you to lose if this is expressive? So, the reimbursement cap itself is quite narrowly tailored. I mean, it's... No, it only applies to them. Why don't you just say, I mean, I think you could say there's a reimbursement... The reimbursement cap, it's the fact that you're targeting individuals that you think, as you say, are manipulating the system. But why don't you just say there can't be reimbursement above a certain rate? Well, so there may be some individuals who are on private insurance for any number of reasons, perhaps through a family member, perhaps through a former employer. What this law targets and addresses is this specific problem of the dialysis providers, Fresenius and DeVita, exploiting this market anomaly where the insurers are now required to cover ESRD patients. And so the reimbursement cap targets this subset, this particular problem. Yeah, but then you're basically acknowledging that it's okay to reimburse at a higher rate, we just don't like how you're doing it. Well, under normal market conditions where people are on private insurance for reasons other than this quid pro quo arrangement, that's different. So it's really protecting the insurance companies, right? It's really providing a protection to the insurance company. No, it's protecting the risk pool, the risk pool... We don't have any evidence about the risk pool, but we do know that if you can say no person who gets, no patient who gets this support can get any benefit from going to a private insurance plan because the private insurance plan won't be able to get any reimbursement above the Medicare rate. Well, your honor, what I will say is that there is evidence that this shift of patients onto the private insurance plans would increase premiums for everyone else. That is a real harm to the public that the legislature is entitled to address. But the point is that could happen in other ways as well. And so you're just, you're, you know... Not to be so jaded about this, but it seems like the insurance companies are like, don't worry about these other people. We have them under control. We don't have these guys under control because they have too much market share. We want you to step in and control that market share and give us a break. And so one thing I should have said earlier on when you brought this up is that it sounds to me like what you're applying or thinking about applying is something like exacting scrutiny or even strict scrutiny. But as we've argued in our briefs... No, I'm just saying under, I mean, if yes, if exacting scrutiny applies, then narrow tailoring applies. And if narrow tailoring applies, then you got to show that there's not a better way to do this. But under a form of intermediate scrutiny like O'Brien, for example, we would have to show tailoring as we have, but it wouldn't necessarily need to be the least restrictive means of addressing the problem. No, but it has to be narrow. Yes. And we think it is. Well, it's hard since there is no evidence of how this works. At least, Berkow didn't have any. I'm sorry? There doesn't seem to be any evidence of how this function works. He was just pointing to broad trends. Yeah. So, I mean, there are inherent challenges in measuring the effects of these shifts on individual patients. All I can do at this point, I think, Your Honor, is refer you to the Berkow, not just his report, his supplemental report incorporating the Trish study and the Avalere report that I mentioned. Okay. With that, I'll shift to the patient disclosure provision, which the American Kidney Foundation has addressed today. This is really just a modest disclosure requirement under Zouderer. It's disclosing the patient's name to the insurer. It's factual. It's uncontroversial. It relates to a product or service that the AKF is providing, namely the premium assistance that's part of this broader financial transaction. It doesn't shill anyone's freedom to associate. And I haven't heard anything today that would really call into question the notion that Zouderer would apply. If the reimbursement cap says, if we determine that the reimbursement cap could not stand, was invalid, is there any basis for the patient disclosure requirement? So, in that scenario, if the court were to hold that the reimbursement cap is unconstitutional, I think the severability analysis as to the patient disclosure cap would be somewhat difficult. It is, frankly, hard to say what the function of that disclosure would be if, you know, in a scenario where the reimbursement cap were struck down. But I do want to also address the reverse, because that has been a focus of the briefing from the other side. So, in the reverse scenario, if the court decides that the district court was correct to uphold the reimbursement cap, but if this court also decides the patient disclosure provision is unconstitutional, I want to discuss that severability point. And so, in that scenario, the reimbursement cap could still function. It would not be as effective as it would be if we had the patient disclosure provision, but there would still be a valid and enforceable provision of the law preventing... But that would anyone know? Yeah. So, I wanted to address that exact point, Your Honor. So, the providers and the insurers will not have perfect information. That's why we've conceded that the patient disclosure provision would facilitate enforcement of the reimbursement cap, but in many cases, both the provider and the insurer, and perhaps both, will know. So, for example, the Dallas providers routinely advise and assist patients with obtaining this premium assistance, so they will often know. There's also no reason in the statute why they simply ask their patients if they're receiving premium assistance. And then, on the insurer's side, there are many situations where AKF is directly paying the premium to the insurer. So, if you ended up in that scenario from the district court, what would the state do when they came in to enforce this? Would they go to them and say, you didn't ask them if they were getting assistance, and so it's on you? In other words, would they just be forced to ask because somehow the state would take the position that it's on them if they don't ask? So, I'm not entirely sure how a public enforcement operation would play out. I think in many cases, perhaps most cases, the provider's already going to know. Okay, that's fine. But you did say... Whether the agency could come in and say, oh, for the patients for whom you didn't know, you really should have asked them, I think that would be a challenging enforcement action. I'm not sure that we would bring... Well, you did say earlier, yeah, that sounds a little troubling. I don't know conceptually what the argument would be that that's inappropriate, but it does seem like it. So, another possibility, Your Honor, would be some private remedy between the insurer and the Dallas's provider. So, the Dallas's provider shouldn't be billing and accepting payment at the higher rate. And so... Yeah, all that sounds a little... And maybe I have to think through it, but it sounds a little troubling to me that if you don't have the disclosure and you're basically saying, well, it's on you, and then you force a lot of voluntary exchange of information, but under the threat of the state coming in and basically saying, well, you didn't ask, we're going to treat it like you have violated the law. I mean, this is a reason why enforcement of the reimbursement cap would certainly be a lot cleaner with the patient disclosure provision. Everyone involved would have better information about how to apply it. It's also a reason why they're not really severable. Even the reverse direction you're saying, it goes to... You're saying, well, yeah, it's a reason why they should go together, but doesn't that kind of cut against your argument that if you go with the way the district court did it, they're still severable? The fact that it would work better with the patient disclosure provision does not defeat severability as a matter of California law. I mean, I think we'd be looking primarily at functional and volitional severability, starting with volitional severability. But the main way you could still try to enforce it if you did sever them raises problems, conceptual... Then that would seem to feed back into severability analysis, but I'll have to think through it. I don't... I mean, I think that there could be providers who felt hard done by a situation where this was being enforced against them might have certain as-applied challenges to how this law is being applied. To me, that doesn't necessarily go to severability. I mean, thinking about volitional severability, the question is really, would the legislature have wanted something rather than nothing? And I think they clearly would have. And then functionally, it is separate. The function would not be as perfect as it would be with the patient disclosure provision, but it would still function for the reasons I've discussed. And if the court is curious about some of the things I've said about why the providers and the insurers are likely to know, I would just point to the HIPP program handbook, which is at ER 222 through 229, a DaVita internal document that's at SER 863, and even the advisory opinion from 1997, which contemplates that in many cases, the dialysis providers will be helping their patients with applying for premium assistance. So the coverage disclosure requirement that the district court upheld, remind me again, is that saying that nonprofits need to disclose that information when they give you financial assistance, or is that saying that the dialysis provider has to disclose that information? My understanding is it would apply to both of them. Okay, so as to the former, it's one thing to say these businesses that are in the business of providing dialysis have to give you a bunch of information. I typically walk out of the doctor's office with a handful of, or an armful of documents. It's another thing to say, to basically force a nonprofit organization and advocacy into doing something they don't do. So why is that not, you know, their argument is that we're not in the mission of like, of giving you advice about insurance. We don't want to be pushed into that. Why is that not problematic? Well, so they're already collecting a bunch of information about the patient's financial status. You know, they fill out this lengthy application. And so, and they're, this patient, a patient who gets the premium assistance is going to be using it for one kind of insurance premium or another, whether it's public or private. It seems to me like a very modest ask to tell that, to say that this foundation that is performing this critical intermediary role in this financial transaction should have to tell the patient, by the way, if you weren't already aware, you may be eligible for Medicare. But to tell them that information, they have to go and collect all that. My understanding was they have to tell them all available health options. So they actually have to go and do a fair amount of research and have a team of lawyers, make sure they got everybody. And they're saying the right things about everything. And I mean, it's just not as simple as somebody jotting down on a notepad and handwriting, you know, here's the five, you know, take this with you. I think it's somewhere between those two scenarios. So we don't read the statute to require, you know, tailored bespoke advice about it to a patient about here's exactly what we know your coverage options would be. Here's exactly how much it would cost you. We're talking about a modest disclosure requirement to make sure that patients are freely exercising their choice and know that when they get this premium assurance, premium assistance, if they do, they can use it for... Well, what I'm thinking about, and I know I'm taking up time, but what I'm thinking about is, you know, let's say a church is providing, you know, help, you know, and then a state says, well, when you provide help to people, you have to provide them a list of all this stuff. And Catholic Charities says, we're just not in that business. Like that's quite a, you know, we have to add staff to do that. That seems problematic, but... Well, and there may be particular concerns in the church context that I don't think are as relevant. Okay, call them the non-Catholic Charities. You know, I'm just saying that a charity that's in the business of just trying to help people, you know, they've got a soup kitchen on the corner, and all of a sudden, a state or a government says, you have to provide all this information. That's a burden. It's not, it does resonate. I mean, to give you a more specific doctrinal answer, I think that Zouder analysis might be very different there, where they could legitimately say, we're not offering a product or service. We're not part of any financial transaction. Well, they are offering soup, and these guys are offering money to pay for dialysis. So I'm not sure that that distinguishes it, but... I see that I'm out of time, and I'll just say, if I could just say one final sentence, which is, you know, if the court decides, for example, that neither party should have been entitled to summary judgment on the reimbursement cap issue, the state is open to the idea of a remand for further factual developments on tailoring. Okay, thank you for your argument. Your Honor, just a few quick points. The first, there's nothing in AB290 that requires insurers to pass along any benefits that they get from this reimbursement cap, and I think that's one of the concerns, that this is, there's certainly no compelling interest in insurers transferring money to insurers from providers. The second, Your Honor, I think correctly noted that the Burtko expert report doesn't find any impact in the past or project any impact in the future. He was the actuary for the exchange plans, and he actually said, we've been great. He was touting his successes. We've been consistent in maintaining low levels, and we haven't seen any impact from ESRD patients in the past. The third observation I want to make is that I want to point the Court to the J.C.'s opinion, which is an association case, and in the J.C.'s case, the Supreme Court was talking about all of the economic benefits. In fact, Justice O'Connor and her concurrence, which didn't carry the day in that case, but highlighted the ways in which members of the Junior Chamber of Commerce benefited from networking, from training opportunities. There are often financial benefits that go side by side with expressive ones. Does it matter the degree to which the financial benefits are here? I mean, they did give some fairly staggering numbers, how much money is flowing through here. Does that weigh against, I mean, does that put this more into a commercial transaction as opposed to expressive activity? No, I think the J.C.'s opinion answers that question. Justice O'Connor, in her separate opinion, which the Court majority did not adopt, wanted a predominant test as sort of what's the predominant function of this association. And because she saw the Junior Chamber of Commerce as predominantly commercial, she said, I would not have heightened scrutiny for this organization. That's not the test that the majority adopted, and we know from the Dale opinion that the test for expressive association is some form of expression. See, I've gone over my time, so unless the Court has further questions, I'll wrap up there. Thank you. Thank you, Bruce. All rise. This Court for this session stands adjourned.
judges: IKUTA, NELSON, VANDYKE